**UNITED STATES of America, Appellee,**

v.

**Frederick SILVESTRI, Elder,
Defendant, Appellant.**

No. 85–1534.

United States Court of Appeals,
First Circuit.

Argued Jan. 10, 1986.

Decided April 1, 1986.

Anthony A. McManus, Dover, N.H., for defendant, appellant.

Mitchell D. Dembin, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, ALDRICH and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This is the second time this search and seizure case has been considered by us. Our first opinion, *United States v. Curry*, 751 F.2d 442 (1st Cir.1984), remanded three matters to the district court for further proceedings, two of which are relevant to this case. We asked the district court to determine whether there were any items introduced into evidence which were in plain view prior to the arrival of the search warrant and, if so, to specify them. Because of a conflation in the search warrant affidavit of the activities of Frederick Silvestri, Sr., and his son, Frederick Silvestri, Jr., we also directed the district court to hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The district court found that there were no plain-view items introduced in evidence. It also found that, under the inevitable discovery exception to the exclusionary rule, evidence not in plain view but seen prior to the arrival of the search warrant was admissible.

After holding a *Franks v. Delaware* hearing, the district court ruled that the search warrant was valid.

Both rulings have been appealed.

PREWARRANT EVIDENCE

Sometime between 3:00 and 3:30 a.m. on April 30, 1982, New Hampshire State Police Officers entered and secured property owned by defendant-appellant Frederick Silvestri, Sr., in New Durham, New Hampshire, pending the arrival of a search warrant. The officers had been told by other police officers that there was reason to believe that large quantities of marijuana were present on the property and that they should secure the premises. There were two buildings on the property: a single family dwelling occupied by defendant and an apartment over a garage occupied by his son's estranged wife. All occupants of the residences were awakened and the police fanned out through the dwellings to ensure that no other persons were inside. Sometime prior to the arrival of the search warrant, Sergeant DuBois asked defendant, who was being detained, if the garage was open. Upon learning that the garage was locked, DuBois asked for the key and defendant provided it. Sergeant DuBois unlocked the garage and looked inside; he saw many bales of marijuana and blocks of

hashish. Sergeant DuBois then called the state police barracks in Epping, New Hampshire, and reported that he had found the garage full of marijuana. A search warrant was ultimately obtained and arrived in New Durham at 11:30 that morning.[1] At that time, the police seized 99 bales of marijuana from the garage, a truck registered to defendant containing 1489 pounds of hashish, a block of hashish in his house, and various documents.

In its original opinion, the district court held that the warrantless entry upon the property in New Durham was "illegal and inexcusable" and could not be justified by exigent circumstances. *Curry*, 751 F.2d 447. This holding was not disturbed by our remand opinion. What is at issue now is the admissibility of the hashish and marijuana found in the garage. Defendant claims that since this evidence was seen by Sergeant DuBois prior to the issuance and arrival of the search warrant, it was illegally seized and must be suppressed. In our remand opinion, we noted that while the Supreme Court had recently held that evidence first observed under a valid search warrant was not tainted by a prior illegal entry, it had left open the question of whether evidence observed during the illegal entry was required to be suppressed. *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The Second Circuit, in a holding not appealed to the Supreme Court, had held in *Segura* that evidence discovered in plain view during the initial illegal entry must be suppressed. *United States v. Segura*, 663 F.2d 411, 417 (2d Cir.1981). The district court had not distinguished between evidence observed prior to the warrant and evidence first observed after the arrival of the warrant in denying defendant's suppression motion and we, therefore, remanded the case back to the district court for a determination as to what, if any, of the evidence introduced against defendant was "in plain view" during the initial illegal entry.

Upon remand, the district court found that the only evidence not found pursuant to the warranted search was the marijuana and hashish found in the garage, and that this evidence was not in plain view. The district court went on to hold that under the inevitable discovery exception to the exclusionary rule endorsed by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), this evidence should not be suppressed. It found that the two preconditions to the application of the inevitable discovery exception were present: the evidence would inevitably have been discovered by a lawful means, *viz*, the warrant, and the lawful means were in progress at the time the evidence was found, *viz*, the preparation of a warrant application.

Defendant argues against the district court's application of the inevitable discovery rule. He first contends that the inevitable discovery rule should not be applied here at all. In the alternative, he contends that if *Nix* does apply, it requires that the legal means for finding the illegally discovered evidence be in process at the time of the discovery. He argues that this requirement was not met here because, contrary to the district court's finding, the warrant application process had not in fact been initiated at the time of the illegal discovery.

Whether or not the district court properly applied the inevitable discovery rule requires first an examination of this circuit's recent opinion in *United States v. Moscatiello*, 771 F.2d 589 (1st Cir.1985). In that case, we applied the independent source exception to the exclusionary rule to permit the admission of evidence found in substantially similar circumstances to those here. In *Moscatiello*, we assumed for the purposes of the opinion that a warrantless entry into a warehouse by police officers which resulted in the observation of numerous bales of marijuana was not justified by

---

**1.** In our previous review, we held that probable cause to search existed prior to the initial entry and that the later-acquired warrant was validly

based upon this probable cause. *United States v. Curry*, 751 F.2d at 448.

exigent circumstances. Subsequent to this entry, a warrant was sought and executed. Focusing upon the reasoning in the Supreme Court's opinion in *Segura* which found that a search warrant issued subsequent to an illegal entry served as an "independent" and untainted source for the evidence first observed during the warranted search, we reasoned that the subsequently obtained warrant could also serve as an "independent justification" for the evidence first observed during the illegal search. *Moscatiello*, 771 F.2d at 603. We held that the initial discovery of the evidence in no way tainted the issuance of the warrant or rediscovery of the evidence pursuant to the warrant. *Id.* We noted that while the majority opinion in *Segura* suggested that suppression of evidence first obtained during an illegal prewarrant entry was a possible consequence of such entry, the dissenters pointed out that if the warrant is an independent source for evidence seen subsequent to an illegal entry, then logically it would also be an independent source for evidence seen during the illegal entry. *Id.* We concluded that because the warrant was clearly independent of the legal entry, it could serve as an independent source for the evidence first discovered during the illegal entry. *Id.*

In light of the analysis in *Moscatiello*, we think it necessary to distinguish those situations in which application of the "independent source" exception to the exclusionary rule, as opposed to the "inevitable discovery" exception, is appropriate. As the Supreme Court pointed out in *Nix*, the "independent source doctrine allows admission of evidence that *has been discovered* by means wholly independent of any constitutional violation." *Nix*, 467 U.S. at 443, 104 S.Ct. at 2509 (emphasis added). The independent source doctrine did not apply in *Nix*, however, because the evidence was in fact discovered by illegal means. *Id.* Now, we must ask which is the proper analysis to apply when evidence is discovered as the result of either an illegal entry or search of premises for which a legal search warrant eventually issues? This will depend upon whether the evidence first ob-

served illegally can be considered to be cleanly "rediscovered" when the warrant is executed. In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source. Although it is tempting to say that the same thing occurs when the warrant is executed, there is an important difference between the classic independent source situation and the warrant situation. The difference is that in the classic situation the tainted evidence is information, which is intangible. In the warrant situation, the tainted evidence will be tangible objects observed during either an illegal security sweep or search. Due to the intangible nature of information, it cannot be seized. Tangible objects, on the other hand, are susceptible to seizure and once seized cannot be cleanly reseized without returning the objects to private control. The question, then, is whether objects seen as the result of either an illegal security sweep or search should be considered illegally seized before the warrant is executed.

In *Segura*, the Supreme Court held that objects first seen during a warranted search, but found on premises which had been secured by the police prior to the issuance of the warrant, were legally seized by the warrant and admissible as evidence. The court based this holding on a determination that a general seizure of premises, such as that effectuated by an exterior securing did not constitute a seizure of the unobserved objects contained within the premises. 468 U.S. at ——, 104 S.Ct. at 3389. However, the Court did go on to point out that an illegal entry into private premises can constitute a search, whether it is limited to a security sweep or a more intrusive invasion, and suggested that such a search may require suppression of all evidence observed during the entry. *Id.*

Although the Court did not explain why such evidence might be suppressed, it must be because once evidence is observed and the premises continue to remain under

the control of the police, the items observed are considered to have been seized by the illegal search. The conjunction of observation of specific objects and the assertion of control over those objects via the "securing" of the property sufficiently affects possessory interests in those particular objects to amount to a seizure. Because the police at no point relinquish control over the premises and the observed objects, there is no interruption of the illegal seizure. As a result, when the warrant arrives, it does not effect a legal seizure of those previously observed and illegally seized items because they cannot be legally seized unless the police relinquish control of them. In *McGarry's Inc. v. Rose*, 344 F.2d 416 (1st Cir.1965), we found that documents previously illegally seized by the IRS could be legally seized a second time because the documents had been returned to the owner in the interim and an independent basis for the seizure had been established. When, however, the items in question are not returned to the control of the owner, they are not in a position to be legally seized. Thus, the independent source exception cannot be applied because the independent source does not result in a legal seizure.

A recognition that items observed during the securing of a premises are illegally seized avoids the concern of the dissent in *Segura* that a later-acquired warrant *vel non* could serve as an independent source for objects initially observed under the illegal seizure as well as objects first observed under the warranted search. *Segura*, 468 U.S. at ——, 104 S.Ct. at 3398 (Stevens, J., Brennan, J., Marshall, J., and Blackmun, J., dissenting). The question in this kind of situation must be, as it was in *Nix*, whether the evidence *inevitably* would have been seized by an independent legal means. The warrant must not only be independent, it must be inevitable as well.

■ In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, the Supreme Court endorsed an additional exception to the basic rule that evidence which has been illegally obtained or derived from illegally obtained evidence must be suppressed. Since suppression of evidence will often have the effect of allowing criminals to go unpunished, it is justified only as a means of deterring the police from violating constitutional and statutory rights. 467 U.S. at ——, 104 S.Ct. at 2503. Thus, when the police are placed in a better position because of their misconduct, the deterrence rationale requires that the advantage be wiped out through suppression. However, the deterrence rationale does not justify putting the police in a worse position than they would have been had no misconduct occurred. *Id.* The Court has found that the "public interest in having juries receive all probative evidence of a crime" outweighs the need to discourage police misconduct. *Id.* Thus, the independent source exception allows the admission of evidence which was gained through an independent source as well as the tainted source. In *Nix*, the Supreme Court extended this reasoning to situations in which the evidence discovered through the misconduct was not actually discovered through an independent source, but inevitably would have been legally discovered had the misconduct not occurred. In these situations, the Court stated there would actually be no additional deterrence value in suppressing the evidence. *Id.* Specifically, the Court reasoned that if, at the time of the misconduct, the police have no reason to believe the discovery of the evidence is inevitable, the existence of an inevitable discovery exception to the exclusionary rule will not provide any incentive to violate the Constitution. In such a situation, the deterrence provided by the basic exclusionary rule should be sufficient to prevent the misconduct. If, on the other hand, the police are aware that discovery is inevitable through lawful means, they have no real need to accelerate discovery through illegal means. *Id.* Furthermore, the possibility of civil liability or administrative punishment should provide disincentives to such "shortcuts." The Court held, therefore, that as long as it can be shown by reference to "demonstrated historical facts," *id.*

at 467 U.S. 445 n. 5, 104 S.Ct. 2509 n. 5, that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible.

■ The district court found that the marijuana and the hashish were discovered in the garage during the illegal entry. Since the police maintained control over the marijuana and hashish until the execution of the search warrant, we find that they were illegally seized and the warrant did not effectuate a legal seizure. The obtaining of the warrant may, however, provide the basis for admitting the materials under the inevitable discovery exception to the exclusionary rule.

We turn first to defendant's contention that the district court erred in finding "that the lawful process of preparing an application for a warrant was going forward at the time of the discovery of the evidence." We find no support for this conclusion in the record.

We begin with an undisputed fact: the initial illegal entry took place between 3:00 and 3:30 a.m. The next significant event was the discovery by Sergeant DuBois of the marijuana and hashish in the garage after obtaining the key from defendant. The district court made no finding of the time this occurred, saying only that DuBois obtained the key "[w]hile the property was being secured, but before the warrant arrived." At the evidentiary hearing held on remand, Sergeant DuBois was not available to testify due to a severe back problem. The government did agree to a stipulation offered by defense counsel as to what Sergeant DuBois would have testified had he been available. The stipulation indicates that Sergeant DuBois looked in the garage "[a]fter they had been there for almost an hour." This would put the discovery of the marijuana and hashish at 4:00 or 4:30 a.m. The next significant event would be the commencement of the process of obtaining the search warrant. The testimony at the evidentiary hearing shows that two officers were involved in the process. Sergeant Carpenito prepared the affidavit and Lieutenant Brown prepared the warrant appli-

cation and warrant at the police barracks in Epping, New Hampshire. The district court found that immediately after Sergeant DuBois' discovery of the drugs in the garage, he relayed his discovery by telephone to "Trooper Brown, who was engaged in seeking a warrant." This would mean that by 4:30 a.m. Lieutenant Brown was at the Epping barracks and preparing the warrant application. The difficulty with this finding is that it lacks support in the record.

The record shows that Lieutenant Brown and Sergeant Carpenito were engaged in surveillance of defendant's property in New Durham when they began following, in separate cars, a Jartran Truck which left the property. Both Carpenito and Brown followed the truck to Leominster, Massachusetts, and participated in an arrest there a little after 1:00 a.m. According to the testimony of Carpenito, he and Brown then went to the Massachusetts State Police barracks in Leominster, arriving around 1:30 a.m., to be interviewed by district attorneys there for search warrants to be executed in Massachusetts. Carpenito testified that he was at the barracks in Massachusetts until 4:00 a.m. and that Brown was with him during this period. Carpenito then left for Epping, New Hampshire. He testified that it took about an hour and a half to get from Leominster to Epping and that he arrived at 6:00 a.m., at which time he began preparing the affidavit. Carpenito testified further that he did not believe that anyone could have started writing the search warrant affidavit earlier than 6:00 a.m. because there was no one in New Hampshire who had been in Massachusetts and had the necessary facts until he arrived at 6:00 a.m. Carpenito also testified that he himself did not receive the phone call from Sergeant DuBois reporting the drugs in the garage and that he did not know who had talked to DuBois personally. Nor does DuBois' stipulated testimony indicate who DuBois spoke to when he called the barracks in Epping. Finally, Lieutenant Brown's own testimony at the hearing says nothing about when he began writing

the warrant application or whether he personally spoke to DuBois about the discovery of the drugs in the garage. He testified only that he was with Sergeant Carpenito while the affidavit was being prepared, that he finished the warrant application a little sooner than Carpenito finished the affidavit and that he left early.

We find no evidence in the record for the district court's finding that Sergeant DuBois spoke to Lieutenant Brown when he called Epping to report his discovery. Furthermore, while the record does not conclusively rule out the possibility that Lieutenant Brown was in Epping at around 4:30 or 5:00 that morning, what evidence there is speaks against it. Carpenito stated that Brown was with him at the Leominster barracks and that it was Brown who was being interviewed by the district attorneys for the Massachusetts affidavits. Carpenito was making telephone calls during this period and waiting to see if they needed to interview him. In order to be in Epping by 4:30 a.m., Brown would have had to leave Leominster at 3:00 a.m. Yet Carpenito, who seems to have been less important than Brown for the Massachusetts affidavits, did not leave Leominster until 4:00 a.m. and testified that he did not believe anyone who had been in Massachusetts was available in New Hampshire any earlier to start the warrant process. We agree with defendant that the warrant process had not been initiated at the time of the discovery of the evidence.

We now consider defendant's claim that *Nix* holds that the inevitable discovery exception applies only where the legal process for discovering the evidence has already been set in motion at the time of the illegal discovery. We have looked closely at the Court's opinion in *Nix* to see if such a holding may be found there and, in our view, *Nix* does not provide a conclusive answer on this issue. To the extent that the Court's holding may be limited by the facts of the case before it, it is possible to narrow the holding of the case, as was done by the dissent, so as to limit the admission of evidence under this exception to evidence that "inevitably would have

been discovered in the same condition by an independent line of investigation that was already being pursued when the constitutional violation occurred." *Id.* 467 U.S. at 458, 104 S.Ct. at 2517 (Brennan, J. and Marshall, J., dissenting). The independent search which the court concluded would have inevitably turned up the murder victim's body was actually in progress and approaching the location of the body when that location was discovered by means of an illegally obtained confession. Nonetheless, the majority did not say that discovery could only be found inevitable if the legal means of obtaining the evidence were in progress at the time the evidence was illegally discovered. It concluded only that the inevitability of the discovery was demonstrated by the ongoing nature of the search and the progress it had already made.

The Fifth Circuit has addressed this issue and has concluded that the legal process of discovery must be ongoing at the time of the illegal discovery in order for the inevitable discovery exception to be applicable. In particular, the prosecution must demonstrate:

(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation.

*United States v. Cherry,* 759 F.2d 1196, 1204 (5th Cir.1985). The Fifth Circuit determined in *Cherry* that this test was consistent with the Supreme Court's reasoning in *Nix* despite the fact that in some cases the application of this rule may put the police in a worse position than they would have been had they pursued available legal means. The court reasoned that application of the inevitable discovery exception in situations in which the police have not been in "active pursuit of an alternate line of investigation that is at minimum support-

able by leads" would promote police misconduct because the police in such a situation would be more likely to believe that the evidence would be undiscoverable unless they engaged in illegal conduct and they would also know that there was a chance that the evidence might not be suppressed if hindsight revealed an alternate legal means to discover it. In such a situation, the police might well reason that they have nothing to lose by engaging in misconduct. The court also pointed out that without the requirement of active pursuit of the alternative legal means, the inevitable discovery exception could come to "swallow the rule by allowing evidence otherwise tainted merely because the police could have chosen to act differently and obtain the evidence by legal means. When the police forego legal means of investigation simply in order to obtain evidence in violation of a suspect's constitutional rights, the need to deter is paramount and requires application of the exclusionary rule." *Id.* In addition to these deterrence concerns, the court also pointed out that where there is nothing more than a "mere intention to use legal means subsequently" on the part of the officer, there are no historical facts upon which to base a finding of inevitability and it is pure speculation. *Id.* at 1205 n. 10. Thus, in *Cherry*, the court refused to admit evidence found during a search made pursuant to illegally obtained consent even though the government plausibly argued that at the time of the search the government had more than enough probable cause to obtain a search warrant. At the time of the illegal search, "the agents had not even begun taking notes for the purpose of drafting an affidavit, a necessary prerequisite to the procurement of a warrant," *id.* at 1206, and, in fact, no attempt to get a warrant was ever made.

Virtually the same rule has been adopted by the Eleventh Circuit. In *United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985), the court found that evidence discovered during an illegal warrantless search which was later followed by a search under a legal warrant was not admissible because at the time of the illegal search the government did not possess a legal means of discovering the evidence, *i.e.*, a warrant, nor were they actively pursuing such means, *i.e.*, they had not initiated the warrant process. The court reasoned that allowing the police to search first and seek a warrant later would vitiate the requirement of the fourth amendment that a warrant be obtained prior to a search. Implicit in the court's analysis also appears to be a concern that the independence of a postsearch warrant will be compromised; "a valid search warrant nearly always can be obtained after the search has occurred." *Id.* 743 F.2d at 846. Reading the opinion in *Nix* narrowly, the court concluded that this analysis was consistent with *Nix*.

The Tenth Circuit has also required that there be an ongoing legal investigation at the time the evidence is illegally discovered. *United States v. Romero*, 692 F.2d 699, 704 (10th Cir.1982). In a post-*Nix* case involving an illegal warrantless search where no warrant was ever sought, the court refused to apply the inevitable discovery exception because no independent investigation was ongoing. *United States v. Owens*, 782 F.2d 146 (1986). The court also quoted the narrow language of the *Nix* dissent, limiting the inevitable discovery exception to situations in which an independent line of investigation was already being pursued at the time of the constitutional violation.

In at least one case, this circuit has also adopted a similar rule. In *United States v. Finucan*, 708 F.2d 838 (1st Cir.1983), we held that the mere fact that illegally obtained documents *could have been* lawfully subpoened by the grand jury was not sufficient to allow application of the inevitable discovery exception. Unlike *McGarry's Inc. v. Rose*, 344 F.2d 419, in which a legal summons was already drafted at the time of the illegal seizure, in *Finucan* there were no legal efforts to obtain the documents prior to the illegal seizure nor sufficient proof that such lawful efforts would

have been pursued and pursued successfully. In post-*Nix* terms, without prior efforts the prosecution did not meet its burden of showing that the discovery of the evidence was inevitable.

On the other hand, the Ninth Circuit, on a fact pattern quite similar to the one at hand here, applied the inevitable discovery exception with no concern for the presence of an ongoing legal investigation. *United States v. Merriweather*, 777 F.2d 503 (9th Cir.1985). In that case, an arrest was made outside a hotel room and FBI agents checked the rooms to see if anyone else was present. During this check, one of the agents searched the toilet tank and found a large sum of money. A search warrant for the hotel room was subsequently obtained based upon information unrelated to the toilet tank search. The court found that the warrant was authorized upon independent information and that the discovery was inevitable because the legal search was carried out by agents ignorant of both the existence and location of the money. Quoting the Supreme Court in *Nix*, the court reasoned that there would be no deterrence value in suppressing the prewarrant evidence.

It is also worth noting that despite the Fifth Circuit's requirement that prior legal efforts be *in esse* at the time of the illegal discovery, first adopted by the Fifth Circuit in *United States v. Brookins*, 614 F.2d 1037 (5th Cir.1980), that court has allowed the admission of evidence first found during an illegal entry when a legal warrant for the premises was subsequently obtained on the grounds that it would have inevitably been discovered under the warrant. *United States v. Fitzharris*, 633 F.2d 416 (5th Cir.1980), *cert. denied*, 451 U.S. 988; 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981).

In addition to these cases, we must also consider the Second Circuit opinion in *United States v. Segura*, 663 F.2d 411, although its analysis did not include the inevitable discovery factor. The Second Circuit held, in a part of its opinion not affected by the Supreme Court's review, that evidence seen during an illegal prewarrant entry should be suppressed despite the later acquisition of a warrant. Suppression was necessary, the court reasoned, because it provided the only effective disincentive to illegal prewarrant entries and searches and, without this disincentive, police officers would find it easy to bypass " 'the constitutional requirement that probable cause should generally be assessed by a neutral and detached magistrate before the citizen's privacy is invaded.' " *Segura*, 663 F.2d at 417 (quoting *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974)).

Our review of these cases reveals that there are three basic concerns which surface in an inevitable discovery analysis: are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection? All three of these concerns are voiced as reasons for adopting a requirement that some kind of active pursuit of legal means be ongoing at the time of the police misconduct.

Confining our analysis to the warrantless search cases, the first distinction to be made is between warrantless searches that are never followed by a warrant and warrantless searches that are followed by a warranted search. In the former situation, the concern for inevitability and the concern for weakening the fourth amendment are two sides of the same coin. In terms of inevitability, it could be argued that allowing the admission of evidence found during a warrantless search merely because the prosecution can show by a preponderance of the evidence that sufficient probable cause existed to justify the issuance of a warrant fails to prove that a warrant would inevitably have been sought or approved by a magistrate. Phrased as a fourth amendment argument, the application of the inevitable discovery rule where no warrant is in fact obtained would substitute proof by a preponderance of the evi-

dence that a warrant could and would have been obtained for the requirement of the fourth amendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search. Such an approach substantially weakens the protection provided by the fourth amendment. When the active pursuit requirement is used, as it was in *Cherry* and *Owens,* to preclude application of the inevitable discovery rule in "no warrant" situations, it is these concerns which are primary.

The stakes are somewhat different in cases where a warrant has been obtained subsequent to the illegal search. The fact that a warrant has been obtained removes speculation as to whether a magistrate would in fact have issued a warrant on the facts and also ensures us that the fourth amendment has not been totally circumvented. However, other concerns rise to the fore. As the court in *Satterfield* suggested, where a warrant is only sought after an illegal search reveals evidence of criminal activity, we begin to worry whether the later warrant is truly inevitable and independent of the police misconduct. Certainly, there is a spectre of random or not so random searches by the police followed by the initiation of an investigation leading to the development of probable cause for all premises showing signs of criminal activity. The Fifth Circuit's requirement that the police possess the leads making discovery inevitable at the time of the misconduct serves to deter such practices, a deterrence which is necessary to protect the fourth amendment requirement that a warrant be obtained *before* a search takes place.

We now turn to the requirement that "the police ... prior to the misconduct ... [be] actively pursuing the alternate line of investigation." *Cherry,* 759 F.2d at 1204. What purpose does this requirement serve? It is clear that in a case like *Nix,* which did not involve a warrant, the active pursuit by the police of a legal avenue of investigation at the time of the misconduct was necessary to convince the Court that the discovery would in fact have been inevitable

and it provided historical facts beyond mere speculation to back up this conclusion. The situation where a warrant is obtained after a warrantless search is somewhat different. The inevitability concerns, *i.e.,* whether a warrant would have issued and whether the search would have uncovered the evidence, are pretty much resolved. In this kind of situation, the requirement of active pursuit could be viewed as ensuring the independent inevitability of the police decision to seek the search warrant, *i.e.,* to ensure that the evidence turned up in the illegal search did not influence this decision. As a protection of the independence of the warrant, however, this bright-line rule goes too far. Most of the time, if the police are already in possession of probable cause for the warrant, a gap between the illegal discovery and the initiation of the warrant will be due to various practical problems entirely unrelated to a decision to seek a warrant. For example, in the case at hand, the delay between the search of the garage and the time that Sergeant Carpenito and Lieutenant Brown initiated the warrant process was clearly attributable to the time it took the two officers to complete their duties in Massachusetts and drive back to New Hampshire. There can be little doubt that at the time the securing of the property was ordered, a decision to seek a search warrant had been made which was in no way influenced or accelerated by Sergeant DuBois' discovery of the drugs.

If the active pursuit requirement is not necessary across the board to ensure that the decision to seek a search warrant on preexisting probable cause is truly independent, that leaves only the deterrence rationale put forward in *Cherry* and *Segura* to justify such a requirement. The *Cherry* court argued that the suppression of evidence illegally discovered at a time when the police were not yet in active pursuit of an alternative avenue of investigation is necessary to remove what would otherwise be an incentive to police to take a chance that the inevitable discovery exception might save the evidence in a situation

where the discovery of the evidence seemed doubtful. We do not find, however, that the use of this requirement achieves this purpose. If the demands that the legal means of obtaining the evidence be both inevitable and independent are strictly enforced, post hoc suggestions of alternate legal means will not be accepted as a basis for application of the inevitable discovery exception.

Rather than setting up an inflexable "ongoing" test such as the Fifth Circuit's, we suggest that the analysis focus on the questions of independence and inevitability and remain flexible enough to handle the many different fact patterns which will be presented. A *Nix*-like case may well require that active pursuit of the investigation be underway to satisfy the test of inevitability and independence. This requirement may also be appropriate in illegal search cases where no warrant is ever obtained. In cases where a warrant is obtained, however, the active pursuit requirement is too rigid. On the other hand, a requirement that probable cause be present prior to the illegal search ensures both independence and inevitability for the prewarrant search situation.

· We conclude, therefore, that in this case there is no necessary requirement that the warrant application process have already been initiated at the time the illegal search took place. Given the facts available to Sergeant Carpenito, who ordered the prewarrant securing of the defendant's premises and later drafted the affidavits for the warrants, we are confident that a search warrant for the garage would have inevitably been sought and issued even if the illegal search had never taken place. The district court properly admitted the drugs found in the garage as evidence.

THE WARRANT AFFIDAVIT

After holding the *Franks v. Delaware* hearing, the district court found that, although the affidavit was confusing and misleading, this was "the result of carelessness and confusion, not the result of intentional deception or reckless disregard of the truth." This finding was based, of course, not only on the testimony adduced at the hearing but on the district court's assessment of the credibility of the affiant.

Although the *Franks v. Delaware* requirement of perjury or reckless disregard of the truth, 438 U.S. at 156, 98 S.Ct. at 2676, was not established, the district court rewrote the affidavit in two forms. One form eliminated the conflation by correctly identifying the father and son, the other expunged all references to the son by referring to him as Frederick LNU (last name unknown). It then held that "neither of the two concurrent requirements of *Franks v. Delaware* ... have been satisfied" and ruled that the search warrant was valid.

The district court's determination of the affiant's credibility was within its discretion and we find no abuse of discretion. Based on our review of the record and the applicable law, we find that the district court made no clearly erroneous findings of fact and no errors of law in conducting and deciding the *Franks* hearing.

*Affirmed.*