**UNITED STATES of America**

v.

**Michael RULLO.**

**Crim. No. 89–286–Wf.**

United States District Court,
D. Massachusetts.

Aug. 31, 1990.

Joseph M. Walker, III, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Frank L. Bruno, Winthrop, Mass., for defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Defendant Michael Rullo was arrested in East Boston, Massachusetts on November 8, 1989 and indicted on November 16, 1989 for possession and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1),

use and carrying of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 111(b). Defendant moved to suppress all statements made by him at the time of his arrest and all evidence found as a result of those statements. In particular, defendant wishes to suppress a handgun he disposed of shortly before his arrest and his statements which allegedly led the police to discover the handgun. Defendant asserts the statements were made involuntarily and in violation of his Fourth and Fifth Amendment rights to due process, freedom from self-incrimination and freedom from unreasonable searches and seizures.

The court held four days of evidentiary hearings on the motion to suppress (the "Suppression Hearing"). The court heard testimony from Keith Gurry, who is a resident of East Boston and eyewitness to many of the events which occurred on November 8, 1989, the defendant, and the following members of the Boston Drug Task Force (the "Task Force"): Drug Enforcement Agency ("DEA") Special Agent Donald Hansen; Massachusetts State Trooper Francis Glasheen; Secret Service Special Agent John Rodrigues; Patrolman Hemenegiodo Martinez; Patrolman Dennis Riordan; Detective Lieutenant Peter Murphy; Detective Joseph Wells; and Massachusetts State Trooper Michael Craven.

For the reasons stated below, the court finds that defendant's statements must be suppressed as improperly obtained in violation of his Fourth and Fifth Amendment rights and that the handgun which was found as a result of those statements must also be suppressed. More specifically, with regard to the handgun, the court finds that the independent source exception to the exclusionary rule does not apply in the instant case and that application of the inevitable discovery exception to the exclusionary rule would be inappropriate because its use here would significantly weaken Fourth and Fifth Amendment protections and abet other police misconduct.

## I. FINDINGS OF FACT

Upon consideration of the evidence presented, including an assessment of the

credibility of the witnesses, the court finds the following facts have been established by a preponderance of the evidence.

On the evening of November 8, 1989, defendant Michael Rullo drove his friend and co-defendant Pasquale Turavani to the parking lot of a Burger King located between Bennington and Saratoga Streets in East Boston, Massachusetts. Turavani got out of Rullo's car and approached a red Corvette occupied by Troopers Glasheen and Craven, who were operating undercover as part of a newly established Boston Drug Task Force composed of federal, state and local law enforcement officials. Rullo stayed in his car. Turavani attempted to make a sale of cocaine to the troopers. The buy had been set up earlier with the help of a confidential informant, who had notified the officers that either Turavani or his companion would be armed. Several other members of the Task Force were in the area surveilling the buy. When these agents moved in to arrest Turavani, he fled across the nearby MBTA tracks. Craven, Agent Rodrigues, Patrolman Martinez, Patrolman Riordan, Lieutenant Murphy, and Detective Wells, among others, chased Turavani, who was apprehended fifteen to twenty minutes later.

Up to this time, none of the Task Force members had observed Rullo with Turavani or had otherwise noted his presence in the area. However, as Turavani fled, Agents Hansen and Hersey, who were stationed in the rear of the Burger King parking lot, saw Rullo walking rapidly across the parking lot in the direction of Saratoga Street. The agents, who were dressed in civilian clothes, requested that Rullo stop. Rullo refused to comply and ran in the direction of Saratoga Street. As he ran, Rullo appeared to keep his right hand either in the waistband of his sweatpants or in his right jacket pocket. Hansen and Hersey chased him with guns drawn, repeatedly yelling at Rullo to stop. The agents were approximately 50 feet behind Rullo at this time. Glasheen followed another 40 to 50 feet further back.

After continuing the chase for a minute or so, Hansen believed he saw defendant jump the fence around a house at the corner of Westbrook and Saratoga Streets and go behind a bush in the house's yard. The court finds that Rullo actually turned the corner. Hansen and Hersey took cover behind a car ten feet from the corner. Hansen heard what he thought were two nearly-simultaneous gunshots, but did not see defendant fire a weapon. Rullo states that he did not fire at the agents, but simply threw the gun away. Rullo states, and the court believes, that the gun discharged once as it hit the ground and that the second shot Hansen believed he heard was merely an echo of the accidental firing.

At this point, Glasheen caught up with Hansen and Hersey. The officers called for backup and initiated a search for Rullo. Over the course of the next 15 minutes, between 50 and 75 law enforcement officers, in uniform or plain clothes, flooded the area. The agents who had been chasing Turavani heard about the alleged shooting and all made their way to Saratoga Street. Several dozen civilians were on the street watching. Some members of the media were also present.

After throwing the gun away, Rullo had run into the backyard of a house and hidden for ten to fifteen minutes. As he started to return to the Burger King via Saratoga Street, Rullo saw the police officers searching for him. He subsequently hid on the raised front porch of a house five buildings down Saratoga Street from the corner of Saratoga and Westbrook. The porch had a low wall behind which defendant was crouching. Rullo was finally located when one of the residents of the house opened the front door and motioned with his head and hand toward the defendant.

Upon locating Rullo, several law officers took cover behind cars on the street in front of the house. Hansen and Rodrigues positioned themselves on the porch of an adjoining house. The officers shouted to Rullo to stand up with his hands raised. At first he did not comply. When they repeated the instruction, he stood up with his hands above his head and his back to the street. His hands were visible and

empty. The officers could not, however, tell if he was still carrying a gun in his waistband or pocket.

At least six and perhaps as many as ten officers rushed on to the porch in a disorganized fashion. The first agent to reach Rullo was Hansen, who believed the defendant had previously fired a weapon at him. Hansen immediately grabbed the defendant and threw him face first on to the floor. Also on the porch initially were Glasheen and Martinez. Rodrigues went up shortly after them, as did Craven and Wells. Murphy did not get on the porch until Rullo was already being lifted to his feet.

Rullo was promptly pushed face down on the floor of the porch, with his left arm pinned behind his back and his right arm underneath him. While he was in this position, several officers started to punch and kick him. Some of the officers admitted to punching him in the right shoulder and side, but stated that their intent was to gain control of his right arm and hand, which they feared held a gun. Rullo remembered being kicked and Gurry and Rodrigues recalled seeing various officers making kicking motions. The court believes this testimony, and finds that the officers on the porch both punched and kicked defendant with the mixed motives of gaining control over his right arm and punishing him for the the shooting they believed occurred. The court also finds that, as Rodrigues testified, the scene on the porch was initially out of control. Rodrigues, as the senior federal agent on the porch, sought to establish control of the situation.

As they punched and kicked Rullo the officers cursed at him, calling him, among other things, a "scumbag" and an "asshole." Defendant and Gurry testified the officers also yelled, "Do you like shooting cops, punk?" All of the agents who testified denied saying this or hearing anyone else say it. The witnesses all agreed, however, that the officers repeatedly questioned Rullo about the location of the gun. Rodrigues told Rullo, "Give us the gun and we'll let you up."

Rullo feared that the beating would open the stitches from his recent hernia operation. He shouted, "Let me up," but the testifying agents did not hear or understand him if he expressed concern about his recent surgery. After several minutes of being beaten, Rullo told the officers that he had dropped the gun at the corner of Saratoga and Westbrook Streets.

The officers handcuffed defendant and pulled him to his feet, at some point patting him down and pulling his sweatpants down around his legs. Rullo's face was bloody from a cut on his forehead received during the beating. At Rullo's request, Wells pulled his pants back up before leading him down from the porch. At this point, Wells told Rullo, "I'm the only friend you've got." He then asked defendant the location of the gun. Rullo again said he had dropped it at the corner.

Wells and Martinez took Rullo off the porch and placed him in the back seat of Martinez' unmarked car. Wells and Martinez then walked away. Murphy got in the back seat with defendant and started wiping blood from his face with a tissue. Riordan got in the front passenger seat and, according to defendant, began to verbally abuse him. A few minutes later, Martinez returned and started shaking defendant, asking him again where the gun was. Defendant responded, "It's got to be there," to which Martinez replied, "Show me." Martinez then got in the car and drove it to the corner of Saratoga and Westbrook.

Meanwhile, Craven, accompanied by an unidentified Boston police officer, had already gone to the corner of Saratoga and Westbrook to look for the gun. Craven had arrived on the porch when defendant was already on the floor and had left the stoop before defendant was brought back to his feet. Although Craven denied hearing defendant say he dropped the gun at the corner, he did recall overhearing someone repeat that comment once he was back down on Saratoga Street. Craven recruited a nearby officer with a flashlight and walked to the corner of Saratoga and Westbrook to look for the gun. They were the

only law officers at the corner until the time the gun was found. They discovered the weapon, a .25 caliber semi-automatic pistol, resting against a concrete slab in front of a bush next to the corner house. The gun, which can carry seven rounds of ammunition, had five shells in it. The officers also found a single shell casing two to three feet from the gun. No second casing was ever found.[1]

While Craven was at the corner, and after he had found the gun, he was joined by other members of the Task Force, including Glasheen, Wells and Martinez. He also saw Rullo outside the police car at the corner at this time.[2] According to Gurry and defendant, whom the court believes, defendant was taken within a couple of feet of the bushes and then nodded with his head in the direction he threw the gun. Defendant was placed back in the car after hearing some officer in the area say "We've got it." At this point, Martinez returned to the car and, along with Murphy, Riordan and a marked police cruiser, drove defendant to DEA headquarters in Boston for booking. Craven stayed and participated in a sweep of the area, seeking additional evidence.

Rullo requested medical attention that evening. Approximately four hours after his arrest he was examined by Emergency Medical Technicians, who bandaged his head wound. He told them he thought his ribs were broken, but they assured him he would be fine. He continued to suffer discomfort from his ribs for the next month and asked for X-rays and medical assistance while he was detained in New Hampshire. He spent three weeks there without receiving assistance. Defendant was subsequently moved to Danbury, Connecticut, where he again requested medical attention. After two weeks there, he was X-rayed, but by that point he was no longer experiencing any pain. No objective evidence was presented to the court concerning any injuries to defendant's chest or ribs.

## II.  CONCLUSIONS OF LAW

To decide this Motion to Suppress the court must determine (1) whether defendant's statements concerning the location of the pistol were obtained in violation of his Fourth or Fifth Amendment rights; and (2) if so, whether the independent source or inevitable discovery exceptions to the exclusionary rule nevertheless permit admission of the pistol into evidence. The court concludes that defendant's statements were made involuntarily as a result of police misconduct in violation of his Fourth and Fifth Amendment rights, that the law officers discovered the pistol as a direct result of his statements, and that application of the inevitable discovery rule under these circumstances would provide an incentive for police misconduct and significantly weaken Fourth and Fifth Amendment protections.

### A.  *Defendant's Statements Were Made Involuntarily and in Violation of his Fifth Amendment Rights*

■ Usually, a defendant, like Rullo, who has been arrested must be advised of his right to counsel and right to remain silent before being questioned. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court recognized a "narrow exception" to the exclusion of admissions obtained without *Miranda* warnings where the questions and responses were "necessary to secure [the police officers'] own safety or the safety of the public." 467 U.S. at 658–59, 104 S.Ct. at 2632–33. Although the questions presented and the information obtained by the officers in this case were concerned

---

1. Defendant testified, and the court believes, that he only loaded six shells in the pistol because it was difficult to press the seventh shell down into the magazine.

2. Craven's testimony, which the court believes, is significant because it corroborates the disputed testimony of defendant and Gurry that Rullo was taken out of Martinez's car after it was driven to the corner and he was walked over to the bushes to point out the location of the gun. This, in turn, tends to suggest the reliability of other disputed aspects of the testimony given by Rullo and Gurry.

solely with the location of defendant's gun, and therefore would often fall under the public safety exception, the court does not find that *Quarles* extends to the circumstances of this case. Rather, where, as here, physical abuse of a suspect is a direct cause of the challenged admissions, the police have not simply breached the prophylactic rules announced in *Miranda*, but have impinged on the suspect's constitutional rights against self-incrimination.

"The question as to compulsion is 'whether the will of the defendant had been overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" *Bryant v. Vose*, 785 F.2d 364, 367–68 (1st Cir.) (quoting *Procunier v. Atchley*, 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971)), *cert. denied*, 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986). Where a defendant claims that his admissions were compelled, the government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Holmes*, 632 F.2d 167, 169 (1st Cir.1980).

The paradigmatic case of involuntariness is where the police have obtained a confession through physical abuse of the defendant. *See e.g. Stein v. New York*, 346 U.S. 156, 182–83, 73 S.Ct. 1077, 1091–92, 97 L.Ed. 1522 (1953), *rev'd on other grounds sub nom. Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). As Justice Robert Jackson wrote in *Stein*, "The tendency of the innocent as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt." 346 U.S. at 182, 73 S.Ct. at 1091. A reasonable apprehension of further beating following a violent arrest may also support a finding of involuntariness. *United States v. Brown*, 557 F.2d 541, 549–50 (6th Cir.1977); *see also* *Cooper v. Scroggy*, 845 F.2d 1385, 1392 (6th Cir.1988) (single blow combined with continuing presence of striking officer created coercive atmosphere which overbore defendant's will).

The motivation of the officers administering the beating is not dispositive of the voluntariness question. *See Leon v. Wainwright*, 734 F.2d 770, 773 (11th Cir.1984) (admissions obtained during beating held involuntary, despite finding that officers motivated by desire to rescue victim rather than to obtain confession). Rather, the inquiry focuses on the existence of police overreaching and the mental state of the defendant. *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The defendant's age, educational background, mental health, and prior experience with the criminal justice system, as well as the nature of the interrogation, are all relevant factors in determining whether his will was overborne. *United States v. Robinson*, 698 F.2d 448, 455 (D.C.Cir.1982) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)); *United States v. Pinto*, 671 F.Supp. 41, 57 (D.Me.1987).

In this case, it is evident that Rullo's will was overborne as a result of police misconduct. Before defendant surrendered, he knew he was the subject of a massive search effort. There were between 50 and 75 officers on the street where Rullo was hiding. Several of the testifying agents described the situation as highly chaotic. The court concludes it was also inherently coercive. *See Brown*, 557 F.2d at 549 (intensity and emotion of manhunt contributed to coerciveness of subsequent interrogation).

Matters deteriorated rapidly once Rullo revealed himself on the porch. Rullo had clearly surrendered to the authorities. He had his back to the arresting officers and his hands up in the air. Instead of being frisked and handcuffed, however, he was forcefully thrown to the ground and surrounded by at least six officers who began to punch and kick him. While the officers

acted in part out of fear that defendant was still armed, their motivation did nothing to alter the pain and alarm which defendant felt.

As they struck him, the agents repeatedly cursed defendant and yelled at him, "Where's the gun?" The language used by the officers and the violence of the arrest convinces the court that, in addition to their desire to find the weapon, at least some of the agents wished to punish Rullo for the shots they believed he had fired at members of the Task Force. Under these circumstances, Rullo's fear for his physical safety was reasonable and compelling. *See Brown*, 557 F.2d at 548, 550 ("manifest hostility" of police toward suspected cop-killer contributed to involuntariness of confession).

Rullo's belief that the beating would not stop until he disclosed the location of the gun was well-founded and sufficient to overwhelm his capacity for rational self-determination. Rodrigues, in fact, reinforced this belief when he told defendant, "Give us the gun and we'll let you up." Rullo's concern relating to his recent operation, whether communicated to the officers or not, also added to his alarm, and led him to make an admission which was not "the product of an essentially free and unconstrained choice." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

As a practical matter, the court recognizes that it may be understandable that law enforcement officers, feeling that shots have been fired at them or one of their colleagues, would be very angry and want to punish a suspect by punching and kicking him. It is not, however, legally permissible for them to succumb to this impulse and, in the process of simultaneously beating and questioning a suspect, coerce him into making statements which directly lead to the discovery of physical evidence that might be used not only to convict him, but to enhance his potential sentence substantially. Thus, Rullo's Fifth Amendment rights were violated.

### B. *The Officers Used Excessive Force In Violation of Defendant's Fourth Amendment Rights*

■ The court has independently considered whether the law enforcement officers used excessive force in incapacitating Rullo and thus violated his Fourth Amendment rights as well. Separate consideration is appropriate because Fifth Amendment issues must be analyzed primarily from the perspective of the defendant and the court must decide the subjective question whether he was actually coerced into making incriminating statements. *Bryant*, 785 F.2d at 367–68. As the Supreme Court has recently clarified, however, Fourth Amendment issues must be analyzed from the perspective of the law enforcement officers and the court must determine whether the amount of force used was "'objectively reasonable' in light of the facts and circumstances confronting them," even though in retrospect it appears in litigation that such force was not really necessary. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

It is, therefore, logically possible that objectively reasonable, but not truly necessary, force might be used to subdue a suspect without violating his Fourth Amendment rights, but that associated questioning might generate responses in violation of his Fifth Amendment rights. Such a situation—involving force which is objectively reasonable from the officers' perspective but subjectively overwhelming from the defendant's perspective—might provide a compelling case for invocation of the inevitable discovery exception to the exclusionary rule which is discussed below.

This, however, is not such a case. Rather, the court concludes that the physical force which contributed to violating Rullo's Fifth Amendment rights also violated his Fourth Amendment rights. More specifically, the court finds that while it may have been objectively reasonable for Rullo to have been forcefully placed on the ground, the punching and kicking to which he was subjected was not reasonable, even accepting that some of the officers had some concern that his right hand might have

held a gun.[3]

### C. Neither the Independent Source nor the Inevitable Discovery Rules Permit Admission of the Firearm into Evidence

Rullo's gun was found as a direct result of his coerced admissions, which were communicated directly or indirectly to Trooper Craven prior to his decision to search the Westbrook–Saratoga corner for the weapon. Unless some exception to the exclusionary rule applies, the weapon, as well as Rullo's statements, must be suppressed as the "fruit" of the government's constitutional violations. *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963); *United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (weapon suppressed as fruit of involuntary confession).

■ The independent source exception to the exclusionary rule is inapplicable to the instant case. This doctrine operates only when the evidence discovered by unlawful means is subsequently or contemporaneously uncovered through an independent, untainted source. *Nix v. Williams*, 467 U.S. 431, 433, 104 S.Ct. 2501, 2504, 81 L.Ed.2d 377 (1984) ("independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation"); *United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988). No such independent discovery occurred here.

■ A closer question exists with regard to the inevitable discovery rule, which allows admission of tainted evidence that would certainly have been revealed in the absence of the police misconduct. This doctrine was endorsed by the Supreme Court in *Nix*, 467 U.S. at 431, 104 S.Ct. at 2503, where the Court found that a murder victim's body, located as the result of an involuntary confession by the defendant, would inevitably have been discovered by an independent search which was in progress when the confession was made. The Court reasoned that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position [then] they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443, 104 S.Ct. at 2509 (emphasis in original). The Court thus held that the inevitable discovery exception applies when the deterrent effect of the exclusionary rule is so attenuated as to be practically inoperable under the facts of a given case. *Id.* at 444–45, 104 S.Ct. at 2509–10.

The Court of Appeals for the First Circuit amplified the contours of the inevitable discovery doctrine for Fourth Amendment purposes[4] in *Silvestri*, stating:

> [T]here are three basic concerns which surface in an inevitable discovery analysis: are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?

787 F.2d at 744. The Court of Appeals devised the third prong of the test in preference to a bright-line rule that the police be in active pursuit of the legal means of discovery at the time the illegal detection

---

**3.** The court recognizes that it is the degree of force, rather than the officers' good or evil intentions, which must be assessed in deciding whether a Fourth Amendment violation occurred. *Graham*, 109 S.Ct. at 1872. An officer's motive to punish a suspect, however, is relevant in assessing the credibility of a claim that facts existed which rendered the degree of force used reasonable. In this case the testimony of several of the officers was impeached in part by the evidence that they had a motive to punish the defendant and succumbed to that impulse.

**4.** The court assumes that the same principles would be applied by the First Circuit in a case involving only a violation of the Fifth Amendment. As demonstrated by *Nix*, the Sixth Amendment case in which the Supreme Court endorsed the inevitable discovery doctrine, the doctrine and its requirements are not peculiar to the Fourth Amendment.

takes place. *Id.* at 746. However, the court also noted that "[a] *Nix*–like case may well require that active pursuit of the investigation be underway to satisfy the test of inevitability and independence." *Id.* In such cases, neglect of the legal means of investigation until after the misconduct has occurred casts doubt on whether the legal means were truly independent of the misconduct and whether the legal means would inevitably have been pursued, or pursued successfully, without the information obtained through the unlawful conduct.

In the instant case, the court concludes that absent Rullo's coerced admissions, the police would have inevitably searched the area around Saratoga and Westbrook Streets for the gun. Given the proximity of the weapon to the location of the suspected shooting, the court also concludes that the firearm would inevitably have been discovered by such a search. However, the court is not persuaded that the other two prongs of the *Silvestri* test are satisfied.

With regard to the first prong, for a legal search to have been "truly independent" of the coerced admissions, it would have had to be conducted by officers who were unaware and uninformed of the content of defendant's statements. The participation or intervention in the lawful search of officers who were not involved in the police misconduct is a constant theme in decisions upholding the application of the inevitable discovery rule. *See Nix*, 467 U.S. at 448–49, 104 S.Ct. at 2511–12 (body would have been discovered by volunteer search party unaware of defendant's admission); *Silvestri*, 787 F.2d at 745–46 (decision to seek warrant made prior to illegal search by officer not involved in search); *United States v. Merriweather*, 777 F.2d 503 (9th Cir.1985) (subsequent lawful search conducted by agents ignorant of existence and location of evidence uncovered by earlier illegal search), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986). Yet in this case, the agents who would have participated in and directed the "inevitable" search of the area include the same officers who participated in

the beating of the defendant and who heard him disclose the location of the weapon, or were told of his statements. It was apparently with precisely such situations in mind that the Court of Appeals for the First Circuit suggested that, in *Nix*–like cases, active pursuit of the legal means at the time of the misconduct might be necessary to satisfy the first prong of the doctrine. *Silvestri*, 787 F.2d at 746.

In addition, and perhaps more importantly, the vital third prong of the inevitable discovery rule test has not been satisfied in this case. With regard to the third prong of the test, application of the inevitable discovery exception in the present circumstances would "either provide an incentive for police misconduct or significantly weaken fourth [or fifth] amendment protection[s]." *Silvestri*, 787 F.2d at 744. The situation in the instant case, the surrender of a suspect believed to be armed, who may have fired on the police, is likely to recur. Application of the inevitable discovery doctrine here would encourage law enforcement officers to believe that they can avoid the burden of a prolonged area search by physically abusing a suspect, without significant risk of forfeiting the admissibility of any physical evidence. They might also reasonably conclude that they would not be jeopardizing their criminal case by retaliating against a suspect who has resisted arrest. Thus, this is the type of case in which the exclusionary rule has a substantial potential deterrent effect which would be significantly weakened if the inevitable discovery rule was applied. *See In re Motion for Return of Property Pursuant to Rule 41, Federal Rules of Criminal Procedure*, 681 F.Supp. 677, 687 (D.Hawaii 1988), *aff'd sub nom. Center Art Galleries–Hawaii, Inc. v. United States*, 875 F.2d 747, 754–55 (9th Cir.1989).

The First Circuit's articulation of the third prong of the inevitable discovery exception also expressly indicates that district courts should consider whether its application would abet police misconduct independent of a weakening of the protections provided by the Fourth Amendment. This additional element of the standard reinforc-

es the conclusion that it would be improper to apply the inevitable discovery exception to save the disputed evidence in this case.

First, in this case the court has found a violation of the protections of the Fifth Amendment, as well as the Fourth. Such misconduct could be encouraged if the inevitable discovery exception was applied in this case.

More significantly, the court believes the excessive physical force which coerced Rullo's incriminating statements does not constitute the sole or last official misconduct which occurred in this case. Rather, despite the court's admonition prior to the commencement of the Suppression Hearing regarding the essential importance of honest testimony, the court concludes that at least one of the Task Force agents—Glasheen—testified improperly. The court found some of the law enforcement officials (particularly Rodrigues, Craven and Wells) to be candid and credible. Others testified in ways which raised doubts regarding their veracity. With regard to Glasheen, however, it was evident to the court that he was aware of some of the legal implications of the questions he was asked and improperly tailored his testimony to give answers, which if believed, would help defeat the motion to suppress. For example, the court concludes that Glasheen either fabricated answers when he had no memory or knowingly testified falsely on issues such as whether Rullo was kicked, *see e.g.* March 7, 1990 Transcript Excerpt pages 7 and 18, and whether Rullo disclosed the location of the gun. *Id.* at 9, 15.[5]

Law enforcement officials are often accused of misconduct, including the fabrication or distortion of testimony. This court has found such charges, when made in federal court, to usually be unfounded. Occasionally, however, such charges have

merit. *See United States v. Pirelli,* 650 F.Supp. 1254, 1263–65 (D.Mass.1986). Regrettably, this is such a case.

Notwithstanding the importance and urgency of combatting crime generally, or of the "War on Drugs" particularly, improper testimony by law enforcement officers remains unacceptable in the United States district courts. This is one of the first cases to arise from the joint federal, state and local operations of the new Boston Drug Task Force. It is essential that the state and local law enforcement officials now increasingly likely to appear in United States district courts understand that misconduct generally, and fabricating testimony specifically, is not only wrong, but may jeopardize the important cases they have bravely taken personal risks to investigate and wish to prosecute successfully.

In view of the improper testimony of Glasheen, which appears to have been intended to conceal a violation of Rullo's Fourth and Fifth Amendment rights, the court finds that to apply the inevitable discovery exception to permit the use of Rullo's coerced statements and the gun discovered promptly as a result of them in the prosecution of this case would abet police misconduct, as well as weaken the protections of the Fourth and Fifth Amendments.[6] Thus, the inevitable discovery rule does not operate to save the disputed evidence in this case.

## III. ORDER

Thus, as the parties have been advised previously, for the foregoing reasons, Rullo's motion to suppress is hereby ALLOWED.

---

**5.** These citations concerning Glasheen's testimony are reflected in the already transcribed excerpt of Glasheen's testimony and are intended to be illustrative, rather than exhaustive, references to his improper testimony.

**6.** As the court has informed the parties in connection with Rullo's proffered plea, in this case at least, the suppression of the firearm for the purposes of computing the applicable Sentencing Guidelines is also necessary and appropriate

to effectuate the purposes of the exclusionary rule. *United States v. Calandra,* 414 U.S. 338, 348–50, 94 S.Ct. 613, 620–21, 38 L.Ed.2d 561 (1974); *United States v. Workman,* 585 F.2d 1205, 1211 (4th Cir.1978) (evidence excluded from probation revocation hearing); *Verdugo v. United States,* 402 F.2d 599, 611–613 (9th Cir. 1968) (evidence excluded from sentencing consideration).