210 F.3d 990 (9th Cir. 2000)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
CHAE WAN CHON, Defendant-Appellant.
UNITED STATES OF AMERICA,Plaintiff-Appelleem,
v.
BUDDY COSTA,Defendant-Appellant.
UNITED STATES OF AMERICA,Plaintiff-Appellee,
v.
MAHLON K. KAPULE, JR., Defendant-Appellant.
 Nos. 98-10469, 98-10470, 98-10478
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 3, 1999
Filed April 20, 2000
 
 COUNSEL: Rustam A. Barbee, Honolulu, Hawaii, for defendant-appellant Mahlon K. Kapule, Jr.; Wayne E. Costa, Jr., Honolulu, Hawaii, for defendant-appellant Buddy Costa; and Ray Allen Findlay, Honolulu, Hawaii, for defendant-appellant Chae Wan Chon.
 Craig H. Nakamura and Leon Schydlower, Assistant United States Attorneys, Honolulu, Hawaii, for the plaintiff-appellee.
 Appeals from the United States District Court for the District of Hawaii; Alan C. Kay, District Judge, Presiding. D.C. No.CR-97-01189-ACK, D.C. No. CR-97-01189-ACK,
 Before: Dorothy W. Nelson, Alex Kozinski, and William A. Fletcher, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 
 1
 Buddy Costa and Mahlon K. Kapule appeal their convictions for stealing and selling United States property, and Chae Wan Chon for knowingly purchasing government property, in violation of 18 U.S.C. S 641. The district court sentenced Costa to twenty-one months imprisonment, Kapule to five months imprisonment, and Chon to three years probation.
 
 
 2
 On appeal, Chon, Costa, and Kapule assert that the district court made four separate errors: (1) the court held that the involvement of the Naval Criminal Investigative Service (NCIS) in investigating the theft of government property was permissible under the independent military purpose exception of 10 U.S.C. S 375;[1] (2) it failed to suppress the evidence obtained as a result of the NCIS investigation; (3) the court failed to order discovery of all materials pertinent to NCIS activities targeting civilians; and (4) the court declined to preclude Special Assistant United States Attorney (SAUSA) Philip Sundel from prosecuting the case due to a conflict of interest.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 In May 1996, Costa and Kapule broke into the Navy Public Works Center in Honolulu, Hawaii, and stole two flatbed trucks, spools of copper wire, and other military equipment. They later sold the stolen wire to Chon, owner of Aiea Recycling Company. On December 10, 1997, a grand jury indicted Costa and Kapule for stealing and selling United States property, and Chon for knowingly receiving such property, in violation of 18 U.S.C. S 641.
 
 
 4
 The indictments were principally the result of leads developed by the NCIS, the investigative unit of the Navy. Most significantly, a cooperating witness informed NCIS agents that he saw copper wire being unloaded from a Navy flatbed truck at Aiea. The agents, accompanied by the FBI, subsequently went to Aiea and questioned Chon as well as seven other civilians who were present on the property. The NCIS obtained Chon's written consent to search the premises and recovered 30 spools of copper wire valued at $17,950.55. Chon stated that he had purchased the wire from an individual named "Buddy" and provided the NCIS agents with Buddy's license plate number.
 
 
 5
 Later that day, Chon was asked to go to the Naval Station where he was again interviewed by NCIS agents. Chon told the agents that Buddy had come to him several times during a four-day period seeking to sell him wire. In addition to discussing these transactions, Chon informed the NCIS agents that Buddy had been accompanied by two other males and provided descriptions of them.
 
 
 6
 Based on the information gleaned from Chon, the NCIS interviewed Kapule's cousin, conducted two photographic line-ups for Chon to identify Kapule, interviewed Costa's former employer, questioned Costa, Kapule, and Kapule's father, and conducted a search of Kapule's residence. These investigative activities were fruitful as the NCIS agents, working with the Honolulu Police Department and the FBI, recovered additional stolen property at Kapule's residence and obtained confessions from Costa and Kapule.
 
 
 7
 During the trial proceedings, Chon, joined by Costa and Kapule, filed a Motion to Compel Discovery seeking information related to any activities of the NCIS and its predecessor agency, the Naval Investigative Service (NIS), that targeted civilians. The magistrate judge denied this motion, noting that the request was a "far reaching fishing expedition." Chon, again joined by Costa and Kapule, also filed a Motion to Suppress Evidence and to Dismiss the Indictment (Motion to Suppress/Dismiss), arguing that the NCIS had violated the Posse Comitatus Act (PCA). During the hearing on the Motion to Suppress/Dismiss, the Defendants made a separate motion for the removal of the prosecutor (Motion for Removal), SAUSA Sundel, claiming a conflict of interest based on his status as an active duty Navy Judge Advocate General. On March 31, 1998, the district court issued an order denying the Motion to Suppress/Dismiss and Motion for Removal.
 
 
 8
 In May 1998, Chon, Costa, and Kapule entered conditional pleas of guilty and reserved the right to appeal the district court's denial of their Motion to Suppress/Dismiss and Motion to Compel Discovery. Five months later, Chon, Costa, and Kapule filed their notices of appeal. By orders entered on November 30, 1998 and December 24, 1998, this court consolidated the appeals. We affirm.
 
 DISCUSSION
 I. Posse Comitatus Act
 
 9
 The PCA prohibits Army and Air Force military personnel from participating in civilian law enforcement activities. See 18 U.S.C. S 1385 (1994).[2] Although the PCA does not directly reference the Navy or Marine Corps, we do not construe this omission as congressional approval for Navy involvement in enforcing civilian laws. See United States v. Kahn, 35 F.3d 426, 431 (9th Cir. 1994). Congress has, in fact, required the Secretary of Defense to "prescribe such regulations as may be necessary" to prohibit "direct participation by a member of the Army, Navy, Air Force, or Marine Corps" in law enforcement activities. 10 U.S.C. S 375 (1998). The Department of Defense (DoD) thereafter, by directive, made the PCA applicable to the Navy and the Marine Corps as a "matter of DoD policy," DoD Directive 5525.5(C); the Secretary of the Navy, using nearly identical language, has adopted this policy, see SECNAVINST 5820.7B.
 
 
 10
 The government argues that S 375 does not apply to the NCIS because most of its agents are civilians. The government bases its claim on SECNAVINST 5820.7B(a)(b) and DoD Directive 5525.5(B), which exempt four categories of people from PCA-like restrictions: (1) members of reserve components when not on active duty; (2) members of the National Guard when not in the Federal Service; (3) civilian employees of DoD unless under the direct command and control of a military officer; and (4) military service members when off duty and in a private capacity. We take these exemptions to mean that the PCA and PCA-like restrictions function to proscribe use of the strength and authority of the military rather than use of the private force of the individuals who make up the institution. In other words, while DoD personnel may participate in civilian law enforcement activities in their private capacities, they may not do so under the auspices of the military.
 
 
 11
 Under this analysis, we find that the PCA-like restrictions adopted by DoD with respect to the Navy apply to the NCIS. Here, the NCIS was the driving force behind going to Aiea and questioning Chon, searching the premises, questioning Costa and Kapule and obtaining their confessions, searching Kapule's home, and recovering stolen government property. In doing so, civilian NCIS agents represented andfurthered the interests of the Navy, and were delegated the same authority to do so as military NCIS agents. When the civilian world is confronted by agents of the Navy, it is unlikely to make the fine distinctions asserted by the government between military and civilian NCIS agents.
 
 
 12
 The government also contends that the NCIS should be exempt from PCA-like restrictions because it is headed by a civilian director with a civilian chain of command. As the record indicates, however, the NCIS Director has a direct reporting relationship to the Chief of Naval Operations, a military officer. Despite a civilian Director, the NCIS continues to be a unit of, and accountable to, the Navy. We thereby hold that the NCIS is bound by the limitations of S 375.
 
 
 13
 Here, however, the NCIS agents' activities were permissible because there was an independent military purpose for their investigation -the protection of military equipment. See DoD Directive 5525.5(A)(2)(a)(5);[3] SECNAVINST 5820.7B(9)(2)(a)(5). Other courts have relied on the military purpose exception to sanction military assistance in law enforcement activities where the illegal acts were perpetrated by military personnel or where civilians committed illegal acts on military bases. See e.g. Applewhite v. United States Air Force, 995 F.2d 997, 1001 (10th Cir. 1993) (holding that the military may investigate illegal drug transactions by active duty military personnel); United States v. Banks , 539 F.2d 14, 16 (9th Cir. 1976) (allowing military personnel to act upon on-base violations of civil law committed by civilians); United States v. Thompson, 30 M.J. 570, 574 (1990) (allowing military jurisdiction over a military member who stole both civilian and military property). As "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, " Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984), we rule in accordance with DoD Directive 5525.5(A)(2)(a)(5) and hold that the NCIS investigation was permissible as it was undertaken for the independent military purpose of recovering military equipment. Because the NCIS action here was valid, we need not address whether the exclusionary rule applies where the PCA is violated.
 
 II. Motion to Compel Discovery
 
 14
 Chon, Costa, and Kapule submitted a discovery request to the government which included such items as copies of all materials pertinent to NCIS activities targeting civilians, materials implicating widespread and repeated violations of the PCA in the State of Hawaii and within the United States, information reflecting warnings to the NIS/NCIS against violating the PCA, and materials of all Organized Crime Drug Enforcement Task Force activities targeting civilians. The district court, opining that the requested discovery was a "far reaching fishing expedition," ruled that the government had met its obligations under Fed. R. Crim. R. 16(a)(1)(C).[4]
 
 
 15
 We review discovery rulings for an abuse of discretion. See United States v. De Cruz, 82 F.3d 856, 866 (9th Cir. 1996). Under that standard, this court cannot reverse unless we have a definite and firm conviction that the district court committed a clear error of judgment. See Valley Eng'rs Inc. v. Electric Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998). To justify reversal of a conviction, Chon, Costa, and Kapule must show a likelihood " `that the verdict would have been different had the government complied with the discovery rules.' " De Cruz, 82 F.3d at 866 (quoting United States v. Baker, 10 F.3d 1374, 1398 n.8 (9th Cir. 1993)).
 
 
 16
 In United States v. Armstrong , 517 U.S. 456 (1996), the Supreme Court considered the parameters of Fed. R. Crim. P. 16(a)(1)(C) and ruled that defendants are entitled to the discovery of only those materials that are relevant to the defendant's response to the Government's case in chief:
 
 
 17
 While it might be argued that as a general matter, the concept of a "defense" includes any claim that is a "sword," challenging the prosecution's conduct of the case, the term may encompass only the narrower class of "shield" claims, which refute the Govern ment's arguments that the defendant committed the crime charged. Rule 16(a)(1)(C) tends to support the "shield-only" reading. If "defense" means an argu ment in response to the prosecution's case in chief, there is a perceptible symmetry between documents "material to the preparation of the defendant's defense," and, in the very next phrase, documents "intended for use by the government as evidence in chief at the trial."
 
 
 18
 Id. at 462. Under Armstrong, the appellants here are entitled to the discovery of only those materials relevant to the charges of theft and conversion of government property and receipt of such property. As the discovery request is considerably broader and the materials in question do not serve the purpose of fortifying the appellants' "shield claims," we find that the district court satisfied the requirements of FRCP 16(a)(1)(C).
 
 III. Conflict of Interest
 
 19
 Upon entering their conditional pleas of guilty, Chon, Costa, and Kapule reserved the right to appeal the district court's denial of their Motion to Suppress/Dismiss and Motion to Compel Discovery. Pursuant to Fed. R. Crim. P. 11(a)(2),[5] they thereby waived all other issues not expressly reserved for appeal. See United States v. Martinez-Vitela, 193 F.3d 1047, 1050-51 (9th Cir. 1999). The appellants here maintain that SAUSA Sundel's status as an active duty Naval officer is an additional basis for dismissal pursuant to their Motion to Dismiss/Suppress. This contention is at odds with the record.
 
 
 20
 The appellants acknowledge that they filed a motion to remove SAUSA Sundel independent of their motion to suppress the evidence and dismiss the indictment; the two motions were distinct despite the Motion for Removal being raised orally during the hearing for the Motion to Suppress/ Dismiss. The district court, moreover, denied the Motion for Removal separate and apart from its denial of the Motion to Suppress/Dismiss. Appellants may not now state that they have subsumed the conflict of interest issue into the larger issue of the Motion to Suppress/Dismiss and have it be so.
 
 
 21
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 10 U.S.C. S 375 restricts the direct participation of military personnel in civilian law enforcement activities: "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." 10 U.S.C. S 375 (1998).
 
 
 [2]
 18 U.S.C. S 1385 stipulates that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. S 1385 (1994).
 
 
 [3]
 DoD Directive 5525.5(A)(2) allows for direct assistance in civilian law enforcement activities where the actions "are taken for the primary purpose of furthering a military or foreign affairs function of the United States . . ." The directive specifies that such actions include the "[p]rotection of DoD personnel, DoD equipment, and official guests of the Department of Defense." DoD Directive 5525.5(A)(2)(a)(5).
 
 
 [4]
 Fed. R. Crim. P. 16(a)(1)(C) stipulates that "[u]pon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant." Fed. R. Crim. P. 16(a)(1)(C).
 
 
 [5]
 Fed. R. Crim. P. 11(a)(2) stipulates that "[w]ith the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion."