*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 07-3219

DAMON ALEXANDER, JR.,

*Defendant-Appellant.*

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00200—James S. Gwin, District Judge.

Argued: June 10, 2008

Decided and Filed: August 18, 2008

Before: BOGGS, Chief Judge; and RYAN and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Jonathan P. Witmer-Rich, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Vasile C. Katsaros, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jonathan P. Witmer-Rich, Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Vasile C. Katsaros, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

BOGGS, C. J., delivered the opinion of the court, in which RYAN, J., joined. COLE, J. (p. 10), delivered a separate concurring opinion.

---

**OPINION**

---

BOGGS, Chief Judge. Defendant Damon Alexander, Jr. appeals from the district court's decision not to suppress the key evidence underlying his plea of guilty to charges of conspiring to possess cocaine and possessing cocaine and cocaine base. Alexander also appeals the district court's denial of his motion to compel discovery of materials produced during an investigation of his alleged beating by a police officer. For the reasons stated below, we affirm.

**I**

**A**

On April 5, 2006, Detective Gene Cook of the East Cleveland Police Department, a canine handler, was assigned parcel interdiction duty at the Cleveland airport air mail facility. Detective Cook had been working in parcel interdiction for approximately 25 years, and he testified that he pulls for scrutiny a half dozen packages per day and that he finds approximately 150 packages per year that contain narcotics. On April 5, Cook was observing express mail coming into the air mail building when his attention was drawn to a package that had been dumped from a bag into a hamper. At the suppression hearing, Cook testified that his attention was first drawn to the package because there was an "X on the signature waiver box on the label," and the X looked "[l]ike it was done with a crayon almost." Cook testified that senders of drugs often waive signature so that the receiver does not have to meet anyone delivering the mail and that drugs are often sent express because dealers want fast delivery. Cook then noticed that the package "was coming from an area that we have gotten drugs from in the past and was going to an area where we have had packages go that contained narcotics." That is, the package had a return address in Las Vegas, Nevada, and was being sent to Shaker Heights, Ohio. Cook also said that he noticed that the sender was a company, but the label was handwritten and not typed. Finally, he noted that the sender had not listed a telephone number. Cook removed the package from the hamper. Cook stated that when he held it, it weighed "a tad over six pounds" and was "dense," meaning there was no shuffling of papers when he shook it.[1]

Cook decided to investigate further, brought the package to an office, and ran the return address against a database using a computer in the office. The address "came back as nonexistent." Cook then hid the package among other mail, retrieved his canine from his car, directed the dog to search. The dog alerted to drugs in that package. Approximately 20 minutes elapsed between the time Cook first noticed the package and his dog's alert.

Cook called Postal Inspector Martin Cernelich. Cernelich obtained a federal search warrant, opened the package, and found two cellophane-wrapped bricks of white powder, which tested positive for cocaine. Cernelich then obtained a search warrant from a state judge authorizing a controlled delivery of the package to Alexander's home and a search of the premises thereafter. Cernelich substituted coffee creamer for two kilos of the cocaine, leaving approximately 500 grams of cocaine in the package. Cernelich also added to the package a transmitter that would alert when the package was opened.

At noon the next day, April 6, Cernelich posed as a postman and delivered the package to Alexander's home. Alexander's wife, Loretta, answered the door and received the package. Approximately fifteen minutes later, the transmitter signaled that the package had been opened. A joint DEA-Shaker Heights Police Department team executed the search warrant.

Cleveland Police Officer Jamal Ansari entered the front door, found Loretta Alexander and Damon Alexander's mother in the living room, and handcuffed them. Loretta Alexander denied having received a package. Officers swept the house and found a loaded .38-caliber revolver, more

---

[1]On cross-examination, Cook admitted that many innocuous items can weigh six pounds and that packaging material can prevent innocuous items from shifting around in a package. Cook also admitted that many cities in the United States would be considered sources of narcotics, including any large west coast city, "probably" any city in Florida, any city from the Southwest, and New York City. Regarding the destination, Cook testified that any city in Northeastern Ohio would have aroused his suspicions and that it was the particular area in Shaker Heights (the area with a zip code ending in the "20's") that made him suspicious in this case. Cook indicated that 35-40% of his positive alerts came from packages directed to the "20's" zip codes.

than one thousand dollars in cash, and mailing receipts. Detective William Ford proceeded to the basement and found Defendant Alexander. Drawing his gun, Detective Ford ordered Alexander upstairs.

There is some dispute about what happened next. At the suppression hearing, Ansari testified that he saw Alexander, without handcuffs, come into the room and approach DEA Special Agent Joseph Harper. According to Ansari, Alexander approached Harper in an aggressive manner, and Ansari moved to take Alexander down to the ground. Harper confirmed that Alexander approached him and used profanity. Ansari said he, Harper, and Alexander struggled for about thirty seconds, and Ansari struck Alexander several times, put his knee on Alexander's chest, and eventually handcuffed him. Ansari testified that he did not see Detective Ford behind Alexander.

Ansari testified that he then took Alexander outside to separate him from the situation in the living room, where Alexander's mother had been handcuffed and placed on the floor. Ansari admitted that he did not read Alexander his *Miranda* rights and told Alexander to admit where the cocaine was. Clifford Williams, Alexander's neighbor, testified that he saw Alexander on his porch with Ansari and Cernelich. According to Williams, Alexander repeatedly requested a lawyer. Ansari denied that Alexander ever requested a lawyer.

Ansari testified that Alexander refused to calm down, so he brought him back inside to the kitchen, swept his feet out from under him, and forced Alexander back onto the ground. The events that followed inside the house are also heavily contested. Ansari testified that he gave Alexander the *Miranda* warnings and told Alexander to tell where he had hidden the drugs. Alexander refused until Ansari said that if he told them the location of the drugs, Alexander would be the only person arrested. Alexander then took Ansari and other officers to the basement and revealed where the drugs were hidden in the ceiling.

Alexander's version of events is very different. According to Alexander and his wife, he entered the living room already handcuffed and was seated in a chair. Alexander stated that Detective Ford had handcuffed him in the basement with his hands in front and yelled out "One is coming up." According to the Alexanders, Ansari grabbed Alexander without provocation, forced him to the ground, then threw him into a chair, and then choked him. Alexander claims he said he wanted a lawyer, and that Ansari then began punching him. Ansari then dragged him outside, saw Williams, and then dragged Alexander back to the kitchen and threw him on the floor. According to Alexander, Ford offered him a seat, but Ansari "lost it" and began yelling "where is the dope?" Alexander claims he was sitting against a wall and that Ansari then began kicking him in the chest. Alexander yelled for help, but a Sergeant Rowe, who was also in the kitchen, allegedly ignored him. Alexander was allegedly kicked three or four more times (for a total of approximately twelve kicks) and stated, "I got to go the hospital. I can't breathe. My chest is killing me. My heart is hurting." Alexander says he told Ansari that the cocaine had gone out the back door, because Alexander feared he would die. Alexander stated that he then showed the officers the cocaine hidden in the basement, and only then was given his *Miranda* warnings.

After he was brought to Shaker Heights jail, Alexander requested that he be taken to the hospital. He was taken to the hospital in an ambulance and received medical treatment. Photographs taken at the time show some bruising on his chest and back, but not on his face. Later, Alexander filed a complaint with the DEA, and the DEA Office of Professional Responsibility (OPR) began an investigation. As part of that investigation, Alexander took a polygraph test. The DEA OPR also took statements from various officers and agents at the scene, including Ansari.

**B**

On April 26, 2006, a federal grand jury returned a two-count indictment against Alexander

and charged him with one count of conspiracy to distribute over five kilograms of cocaine and one count of possession, with intent to distribute, of over 500 grams of cocaine. On October 27, 2006, Alexander moved to suppress the evidence and a statement from his arrest. The same day, Alexander requested additional discovery, including "all documents related to any and all investigations into police misconduct," specifically any polygraph results and any statements from other officers at the scene. The government responded that it was not obliged to provide that additional discovery, and Alexander moved to compel discovery on November 8.

A suppression hearing was held on November 13 and 14, 2006. On November 14, a federal grand jury returned a superseding indictment against Alexander adding count three, charging possession, with intent to distribute, of over five grams of crack cocaine, and count four, charging being a felon in possession of a firearm.

On November 20, the district court denied the motion to suppress, ruling that reasonable suspicion supported Cook's inspection of the package and that the inevitable discovery doctrine dictated that the drugs found at Alexander's home not be suppressed. Regarding Detective Cook's initial decision to inspect Alexander's package, the court credited Cook's experience and concluded that Cook had explained sufficient articulable facts to support a reasonable suspicion that Alexander's package contained drugs. Regarding Alexander's claim that the officers at his home violated his Fifth Amendment right against self-incrimination, the court found that Ansari's testimony was not credible and that a completed *Miranda* form was not added to the case file. The district court held that Ansari had violated Alexander's Fifth Amendment rights and suppressed Alexander's statements made at the house. Regarding Alexander's claim that his alleged beating should result in application of the exclusionary rule, the district court noted that Ansari's violation of Alexander's Fifth Amendment rights, i.e., continuing interrogation after Alexander requested a lawyer, would normally result in exclusion of the evidence obtained as a result of the violation. However, the district court further held that the Government had proved that it would have inevitably discovered the evidence without Ansari's misconduct. The district court did not make any explicit findings as to whether Ansari had or had not beaten or kicked Alexander.

On November 27, the district court denied Alexander's motion to compel discovery as being moot in light of its having denied the motion to suppress.

On December 7, 2006, Alexander entered a conditional plea agreement, in which he pled guilty to all four counts, but reserved his right to appeal the suppression ruling. On February 10, 2007, the district court sentenced Alexander to 110 months' of imprisonment on all four counts, the time to run concurrently.

## II

### A

When we review a ruling of a district court on a motion to suppress evidence, we review findings of fact for clear error and conclusions of law de novo. *United States v. Gant*, 112 F.3d 239, 241 (6th Cir. 1997). "However, the evidence must be viewed in a light most likely to support the decision of the district court." *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008).

In this appeal, Alexander argues that the package of cocaine should have been suppressed for two alternative reasons. First, he argues that Officer Cook had no basis for subjecting the package to extra scrutiny at the airport mail facility. Second, he concedes that the package would inevitably have been discovered, but he argues that his alleged beating at the hands of Officer Ansari should preclude application of the inevitable discovery doctrine. Neither argument has merit.

**B**

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It has long been held that first-class mail such as letters and sealed packages subject to letter postage . . . is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment." *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970); *see also  United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy . . . ."); *Ex parte Jackson*, 96 U.S. 727, 733 (1877) ("Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles.") (quoted in *Van Leeuwen*, *supra*).

However, "even first-class mail is not beyond the reach of all inspection . . . ." *Van Leeuwen*, 397 U.S. at 251.  In *Van Leeuwen*, the defendant mailed two packages at the post office, the postal clerk told a police officer that he thought Van Leeuwen's packages were suspicious, and the officer examined the packages and detained them pending further investigation.  The investigation revealed further facts supporting the suspicion that Van Leeuwen was trafficking in illegal coins, and the officer obtained a warrant to open the packages.  The Supreme Court held that the nature and weight of the packages and the fact that the return address was fictitious "certainly justified detention [of the packages] without warrant, while an investigation was made." *Id*. at 252.  Follwing *Van Leeuwen*, we have held that "only reasonable suspicion, and not probable cause, is necessary in order to briefly detain a package for further investigation, such as examination by a drug-sniffing dog." *United States v. Robinson*, 390 F.3d 853, 870 (6th Cir. 2004).

Although we have not adopted the Postal Service's "drug package profile" as the test for reasonable suspicion, we have relied on many of the same factors in analyzing an officer's decision to investigate a package.[2]  For example, we have found reasonable suspicion where the package smelled of marijuana, had a return address from a known drug distribution area, and had handwritten labels.  *See Robinson*, 390 F.3d at 859.  In another case, we held that postal authorities had reasonable suspicion to present a package to a drug-detection dog because the package had been mailed from a city known to be a source of illegal drugs, the package showed a fictitious return address, and three other packages with fictitious return addresses had been mailed to the same address. *See United States v. Elgin*, 57 F. App'x 659, 660 (6th Cir. 2003).

In this case, Detective Cook's suspicion was reasonable.  On this particular package, the signature was waived with an "X" mark, the package seemed "dense," the label was handwritten, the package was coming from Las Vegas and going to Shaker Heights, and the return address was fictitious.  Given these circumstances, we hold that there was sufficient evidence of criminal activity afoot to warrant detaining the package for further investigation.  Alexander argues that the address may actually have been valid, and that Cook was mistaken.  However, the fact that the return address may actually have been valid is irrelevant.  "The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion

---

[2]The Postal Service's "drug package profile" targets packages based on: (1) the size and shape of the mailing; (2) whether the package is taped to seal all openings; (3) whether the mailing labels are handwritten; (4) whether the return address is suspicious, *e.g*., the return addressee and the return address do not match, or the return address is fictitious; (5) unusual odors coming from the package; (6) whether the city of origin and/or city of destination of the package are common "drug source" locales; and (7) whether there have been repeated mailings involving the same sender and addressee. *See United States v. Underwood*, No. 95-5441, 1996 WL 536796, at \*3 (6th Cir. Sept. 20, 1996); *see also United States v. Daniel,* 982 F.2d 146, 150 n.5 (5th Cir. 1993); *United States v. Lux*, 905 F.2d 1379, 1380 n.1 (10th Cir. 1990).

occurred." *Jacobsen*, 466 U.S. at 115. At the time he detained the package and subjected it to a dog sniff, Cook had made a reasonable effort to verify the address and received a report that it was fake. Thus, reasonable suspicion existed to justify detaining the package pending a dog sniff, which occurred within approximately twenty minutes of the time Cook first noticed the package.

## C

Alexander next argues that we should carve out an exception to the inevitable discovery doctrine for those cases in which the police assault a suspect to make him reveal where he has hidden evidence. According to Alexander, the exception is required to deter police from using illegal force to hasten searches. We disagree.

The exclusionary rule bars the admissibility of items seized during an unconstitutional search. *See Weeks v. United States*, 232 U.S. 383 (1914). The "fruit of the poisonous tree" doctrine bars "introduction of derivative evidence . . . that is the product of the primary [illegally obtained] evidence [or testimony]." *Murray v. United States*, 487 U.S. 533, 536-37 (1988). However, evidence obtained through unlawful means may still be admitted under the inevitable discovery doctrine. In *Nix v. Williams*, 467 U.S. 431, 444 (1983), the Supreme Court held, "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received."

More specifically, we have stated that, "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995).[3] The inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.* at 498 (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)). The burden of proof is "on the government to establish that the tainted evidence 'would have been discovered by lawful means.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (quoting *Nix*, 467 U.S. at 444).

In this case, Alexander concedes that the police would have inevitably found the cocaine, despite Ansari's violation of Alexander's Fifth Amendment rights. Alexander does not contest the validity of the search warrant, which authorized the police to search Alexander's home for "cocaine, other narcotic drugs, and/or controlled substances." Nor does he contend that the police would not have found the package in the course of a thorough search of the basement.

Rather, Alexander argues that this court must, as a matter of law, "consider the severity and intentionality of the government's constitutional violation in deciding whether the inevitable discovery rule applies." Appellant's Br. at 47. According to Alexander, "if admitting evidence obtained through police misconduct would either (1) provide an incentive for police misconduct, or

---

[3]Although the district court quoted and applied the *Kennedy* court's language, it erred in also quoting and applying another formulation of the rule from the case of *United States v. Buchanan*, 904 F.2d 349, 356-57 (6th Cir. 1990). In *Buchanan*, the Government had proposed that this court adopt the inevitable discovery rule of the Fifth Circuit, which required that the police be actively pursuing an alternate line of investigation prior to the misconduct. *See id.* (quoting *United States v. Webb*, 796 F.2d 60, 62 (5th Cir. 1986)). The *Buchanan* court did not adopt the Fifth Circuit's test. *See id.* at 357. In this case, however, the district court quoted the *Buchanan* court as if *Buchanan* had adopted the *Webb* rule. The district court then applied that test and held that the inevitable discovery doctrine applied because the house search was underway while Ansari was violating Alexander's *Miranda* rights. That is a misstatement of Sixth Circuit law. *See Kennedy*, 61 F.3d at 499-500 (holding that "an alternate, independent line of investigation is not required for the inevitable discovery exception to apply"). Our de novo review cures that error.

(2) significantly weaken respect for constitutional protections, then the evidence should be excluded." Appellant's Br. at 48. Alexander's argument relies primarily on First Circuit case law stating that:

> [T]here are three basic concerns which surface in an inevitable discovery analysis: are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and *does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment [sic] protection*?

*United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir. 1986) (emphasis added), *cert. denied*, 487 U.S. 1233 (1988); *see also United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001) (describing the court's continuing adherence to *Silvestri*).

In particular, Alexander cites an opinion from the District of Massachusetts holding that the inevitable discovery rule did not apply when police had tackled and beaten a suspect (they believed he had shot at them) until he confessed where he had thrown away the gun during the prior foot chase. *United States v. Rullo*, 748 F. Supp. 36, 44 (D. Mass. 1990). The district court held that police had violated Rullo's Fourth and Fifth Amendment rights and suppressed the gun, even though police credibly testified that they would have found it anyway, thus satisfying the second prong of *Silvestri*. Rather, the court held that the first and third prongs of *Silvestri* had not been satisfied. The first prong required independent legal means, and the court held that all of the officers who would have been involved in a subsequent search were tainted by their participation in the beating. *See ibid.* The court then held the evidence inadmissible under *Silvestri*'s third prong, because application of the inevitable discovery rule "would encourage law enforcement officers to believe that they can avoid the burden of a prolonged area search [for a weapon] by physically abusing a suspect, without significant risk of forfeiting the admissibility of any physical evidence." *Ibid.* Thus, the court concluded, "this is the type of case in which the exclusionary rule has a substantial potential deterrent effect which would be significantly weakened if the inevitable discovery was applied." *Ibid.* Alexander argues that *Rullo*'s logic applies directly to his case and speculates that Ansari "*knew* he could get away with violating Mr. Alexander's constitutional rights and beating [sic] him into revealing the location of the drugs, because even if that constitutional violation was someday recognized by a court, the drugs would come in anyway." Appellant's Br. at 53.

Alexander's argument is unpersuasive for several reasons. First, no other courts have adopted the *Silvestri* formulation of the inevitable discovery rule. Second, *Rullo*'s application of *Silvestri* and its resulting holding have found no support. *See United States v. Ford*, 22 F.3d 374 (1st Cir. 1994) (noting that *Rullo* was the only case to date in which a First Circuit court had refused to apply the inevitable discovery doctrine due to the incentive for police misconduct).

Third, and most importantly, Alexander's argument gives short shrift to the *Nix* Court's determination that the inevitable discovery rule applies even if there were police misconduct. In evaluating whether exclusion is proper, courts must "evaluate the circumstances of th[e] case in the light of the policy served by the exclusionary rule." *Brown v. Illinois*, 422 U.S. 590, 604 (1975). It is true that the "rule is calculated to prevent, not repair. Its purpose is to deter – to compel respect for the constitutional guaranty in the only effective way – by removing the incentive to disregard it." *Id.* at 599-600 (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). However, the *Nix* Court was very clear that despite these purposes of the exclusionary rule, the government cannot be made worse off because of misconduct than it would have been if the misconduct had not occurred. *See* 467 U.S. at 443-44 ("[T]he derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police error or misconduct. . . . [E]xclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place").

Thus, Officer Ansari's allegedly illegal conduct cannot make the government worse off than it would have been had Ansari fully respected Alexander's rights.

Fourth, Alexander is simply incorrect in stating that only suppression of the evidence will deter police misconduct. As Judge Posner has stated, the inevitable discovery doctrine "merely recognizes that if there is a lawful basis for the seizure of some evidence, the fact that the seizure was also based on illegal acts need not trigger punishment, because the acts did no harm (no harm so far as obtaining the evidence was concerned – there might be collateral damage, remediable by suits under 42 U.S.C. § 1983 or state tort law, to property or privacy interests of the defendant)." *United States v. Johnson*, 380 F.3d 1013, 1017-18 (7th Cir. 2004). That is to say, the availability of a § 1983 action against the officer, although designed primarily to compensate for injury, also functions to deter police misconduct. So too does the possibility of administrative investigation – indeed, here, such an investigation was begun – which may result in discipline or termination (or even criminal charges).

Fifth, adopting a rule that the severity of police misconduct should factor into inevitable discovery analysis would import a very difficult, fact-sensitive, inquiry into an otherwise relatively clear doctrine. If, as Alexander suggests, the subjective "intentionality" of the officer's conduct is relevant, determining that subjective state of mind will likely be extremely difficult. Indeed, at oral argument, Alexander's counsel argued that evidence would be suppressed only when an officer specifically intended to hasten a search and not if the officer had any other motive (or no discernable motive at all) for abusing a suspect. Interlocutory appeals would, of course, multiply.

In conclusion, we decline to adopt the approach of the *Rullo* court. The inevitable discovery doctrine serves a valid purpose, clearly delineated by the Supreme Court – to ensure that the Government is not put in a worse position because of misconduct than it would have been absent the misconduct. Alexander is free to pursue a civil remedy via a § 1983 suit against Ansari and others, but the evidence was properly admitted in his criminal trial.

## III

Finally, Alexander appeals the district court's denial of his motion to compel discovery of "all documents related to any and all investigations into police misconduct," specifically any polygraph results and any statements from other officers at the scene. Alexander argues that the district court erred in refusing to compel discovery because Federal Rules of Criminal Procedure 26.2 and 16(a)(1)(F) mandate discovery of the statements and the polygraph results, respectively.

Unfortunately for Alexander, he failed to preserve his right to appeal this particular decision when he entered his conditional plea. Federal Rule of Criminal Procedure 11(a)(2) authorizes defendants to enter conditional guilty pleas, "reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion." Accordingly, "[w]here a defendant does not specify an issue for preservation on appeal, federal courts have normally held that Rule 11(a)(2) bars its presentation on appeal." *United States v. Martin*, 526 F.3d 926, 932 (6th Cir. 2008). In this case, Alexander entered a conditional guilty plea that preserved only his right to appeal the denial of his motion to suppress. The plea agreement does not advert to the district court's denial of Alexander's motion to compel discovery. Accordingly, his appeal of that ruling is not properly before us. *See generally United States v. Pickett*, 941 F.2d 411, 416 (6th Cir. 1991); *cf. United States v. Chon*, 210 F.3d 990, 994-95 (9th Cir. 2000) (addressing district court's denial of motion to compel discovery because defendants had preserved the issue in their conditional guilty pleas). While our concurring colleague is probably correct that we may, in extraordinary circumstances, choose to take cognizance of a claim not properly preserved, we see no reason to do so in this case.

**IV**

Therefore, for the reasons set out above, we AFFIRM the judgment of the district court.

---

**CONCURRENCE**

---

COLE, Circuit Judge, concurring. I concur in the outcome of the majority's opinion, but write separately because I disagree with the majority's conclusion that Alexander failed to preserve his motion to compel discovery when he entered a conditional plea preserving his right to appeal the denial of his motion to suppress. (Maj. Op. 8-9.)

In this case, the motion to suppress and the motion to compel discovery were dependent on one another, as Alexander filed the motion to compel discovery for the sole purpose of discovering evidence that would support the motion to suppress. This much is evident by a review of Alexander's initial discovery motion that was filed along with his motion to suppress, the arguments made in his motion to suppress that reference the necessity of acquiring the information listed in the discovery request, Alexander's motion to compel discovery, and the district court's denial of the motion to compel discovery as moot given its denial of Alexander's motion to suppress. For these reasons, I conclude that Alexander's conditional plea preserved both of these issues for review. Accordingly, I would reach the issue but affirm the district court's denial of the motion for the reasons given by the district court.

The authority cited by the majority does not support an opposite conclusion. The case cited for direct support, *United States v. Martin*, 526 F.3d 926 (6th Cir. 2008), involved a determination of whether a defendant had preserved a sufficiency-of-the-evidence claim. This motion was not related to the conditional guilty plea's preservation of a motion to suppress, *id.* at 932, and therefore the determination made by the Court is not applicable to the situation before us. Similarly, in the Ninth Circuit case cited by the majority, *United States v. Chae Won Chon*, 210 F.3d 990 (9th Cir. 2000), the court concluded that both the motion to suppress and the motion to compel discovery were preserved because they were both explicitly included in the guilty plea. However, these motions were independent from one another, as the discovery request included a request for information that would support the defendants' theory of defense, which was not at issue in their motion to suppress. *Id.* at 994-95. Further, that court did conclude that a third issue had not been preserved because it was not included in the conditional plea, but explicitly stated that this non-preserved motion was "independent" from the preserved motions and "separate and apart from" those that had been preserved. *Id.* at 995.

I agree that Federal Rule 11(a)(2) and our Court's jurisprudence provide that "[w]here a defendant does not specify an issue for preservation on appeal, federal courts have normally held that Rule 11(a)(2) bars its presentation on appeal." *Martin*, 526 F.3d at 932. However, I also note that Rule 11(a)(2) was "necessary precisely . . . to avoid the expense of trial when all parties agree that the only dispositive issues remaining are those properly raised in pretrial motions." *United States v. Pickett*, 941 F.2d 411, 417 (6th Cir. 1991). In this instance, the "dispositive issue" remaining is whether the district court properly denied Alexander's motion to suppress; the motion to compel discovery involves only requests for information that support the motion to suppress. Rule 11(a)(2) does not bar this type of issue from review on appeal, but instead bars defendants from "rais[ing] subsequently collateral challenges to his conviction." *Id.* at 416. Accordingly, Alexander's motion to compel discovery should be considered preserved.